Filed 3/26/13  Jennifer G. v. Super Ct. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| JENNIFER G., | D063314 |
| Petitioner, | |
| v. | (San Diego County Super. Ct. No. EJ3459C) |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Real Party in Interest. | |


PROCEEDINGS in mandate after referral to a Welfare and Institutions Code

section 366.26[1] hearing.  Gary M. Bubis, Judge.  Petition denied; request for stay denied.


Jennifer G. seeks writ review of a juvenile court order terminating reunification

services in the dependency case of her daughter, Charlotte G., and setting a section

---

[1]     Further statutory references are to the Welfare and Institutions Code.

366.26 hearing.  Jennifer contends the evidence is insufficient to support the finding she received reasonable reunification services.  We deny the petition.

FACTUAL AND PROCEDURAL BACKGROUND

Jennifer separated from Charlotte's presumed father, Jon G., in August 2010, before Charlotte's birth in January 2011.  The divorce was final before the commencement of this case.  Jennifer and Jon are the parents of twin boys, born in October 2001, who are not subjects of this appeal.  We refer to Charlotte and the twins collectively as the children.

In September 2011, the San Diego County Health and Human Services Agency (the Agency) filed a dependency petition for eight-month-old Charlotte.  The petition alleged Jennifer hit one of the nine-year-old twins on the face, causing a hand-shaped bruise, and also hit him on the neck.  A medical expert believed Jennifer acted intentionally.  Jennifer initially denied hitting the twin, but later admitted she scratched his face because he was "choking" or "smothering" Charlotte.

Charlotte was detained in a foster home.[2]  At the detention hearing, the court ordered the Agency to provide services including crisis intervention, case management, counseling and transportation services.  The court advised Jennifer that her reunification services might be limited to "no more than six months" because Charlotte was younger than three years old (§ 361.5, subd. (a)(3)).  In November 2011, the court entered a true finding on the petition; ordered Charlotte removed from Jennifer's custody and placed in

_____

[2]     The twins were detained in a separate foster home and lived apart from Charlotte throughout this case.

2

foster care; and ordered reunification services. The court again advised Jennifer that she would "have no more than six months" to reunify with Charlotte (*Id.*, subd. (a)(3)). Jennifer's reunification plan included individual therapy, a parenting class designed for perpetrators of physical abuse, the Incredible Families program and parenting education classes.

Jennifer made limited progress in therapy and parenting education, causing the Agency to question whether she "had the cognitive ability to . . . understand . . . the concepts that were being presented." The Agency consulted with Jennifer's therapist and, in January 2012, the therapist recommended a psychological evaluation. The evaluation, which took place in April, revealed that Jennifer suffered from a learning disorder and possibly a phonological disorder. Her intellectual functioning was in the borderline range, and her academic performance was in the first to eighth grade range. The evaluator determined Jennifer needed "extensive interventions" to assist with chores "such as managing finances, filling out paperwork correctly, and juggling multiple tasks." The evaluator concluded that "treatment should be modified to be more concrete, psychoeducational goals should be clearly stated in simple terms, and a focus should be on connecting [Jennifer] to various community resources in order for her to gain the extra support she will need." The evaluator stated that "it will take [Jennifer] longer than most to achieve treatment goals," and noted "it is not unusual for someone with the functioning level of [Jennifer] to take [two]-[three] times as long as other adults." In addition to therapy, Jennifer needed parenting classes, although she had already completed the Incredible Families program with perfect attendance.

3

After receiving the psychological evaluation, the Agency asked the Regional Center to interview Jennifer. Jennifer said she would follow through with the interview, declined the Agency's offer of assistance and said a friend was helping her. Jennifer did not follow through, and the social worker began the Regional Center application process for her.

In late April 2012, Jennifer informed the Agency she was moving to Fresno. On May 1, Jennifer stopped attending therapy. By the time of the six-month review hearing on May 2, she had decided not to move to Fresno. At the hearing, the court found Jennifer had been provided reasonable services and continued her services. On May 29, Jennifer resumed therapy. By July 16, she had completed three Incredible Families "booster" sessions. The Agency recommended Jennifer receive home visits from a parenting educator, but the friend with whom Jennifer was living would not allow it.

On July 25, the twins began a 60-day trial visit with Jon. That day, Jennifer and Jon announced "they wished to co-parent the children." Although Jon had previously showed little interest in Charlotte, he now assumed "a parental leadership role" and gave Jennifer parenting advice. Jennifer responded positively to the advice. Her therapist believed Jennifer would be unsuccessful in "living independently and solely trying to manage a household, working, and caring for her children."

The Agency arranged for in-home services for Jon through New Alternatives, with the idea that the services would also benefit Jennifer, although she was not living in the home. Therapeutic Behavioral Services from New Alternatives included family therapy, behavioral coaching and parenting education. After the in-home services began, New

4

Alternatives notified the Agency that Jennifer was consistently present for sessions and Jon was not. Jennifer made little progress. She had a limited ability to contain the twins' behavior, which included throwing things and verbally threatening Charlotte.

By October 19, 2012, Jennifer had not met with Regional Center personnel to determine her eligibility for Regional Center services. Jennifer and Jon told the social worker they did not need the Agency's services and viewed the Agency's involvement as intrusive and inappropriate. On October 22, Jennifer's therapist recommended in-home services in lieu of therapy. On October 30, the Agency recommended Jennifer's reunification services be extended for six months, to the 18-month date, and that she be permitted to move into Jon's home.

In late November 2012, the social worker asked Jennifer about the status of her Regional Center application. Jennifer said she was unaware of the status and a New Alternatives behavioral coach was assisting her with the application. On December 3, the social worker contacted the Regional Center and learned Jennifer had not been assigned an intake social worker. On December 4, the Agency determined that Charlotte could not be safely returned to Jennifer's care and recommended that Jennifer's reunification services be terminated.

On December 6, 2012, a New Alternatives representative informed the Agency that New Alternatives was terminating in-home services because the goal of obviating a higher level of care for one of the twins had been achieved. The representative said that when a behavioral coach asked Jennifer how things were going in the home, Jennifer said "fine," although one of the twins had been suspended from school for hitting the other

5

twin. New Alternatives had offered Jennifer and Jon further services, but they had declined. On December 10, the Regional Center informed the Agency that Jennifer did not qualify for Regional Center services.

The 12-month review hearing took place on January 15, 2013. Social worker Kimberly Lawhead, who had been assigned to the case on January 1, testified that she visited Jennifer's home on January 4. The twins were there and were yelling, swearing and ignoring Jennifer's request that they stop swearing. Jennifer said Jon planned to move. Jon confirmed this, and said he was not sure if the boys would move with him. Jennifer had completed her services and said she did not need further services. Lawhead knew of no additional services that would help Jennifer address the protective issues and make it safe for Charlotte to be returned to her care in the next six months.

Jennifer testified that if Charlotte were returned to her care, they would live with Jon and the twins. She believed it would be safe for Charlotte to live in the same home as the twins, but was willing to live apart from the twins if the Agency believed the twins presented a danger.

The court found Jennifer had participated in services and made some progress. In finding that reasonable services had been provided, the court stated "all reasonable alternatives were explored" with regard to Jennifer's "information processing." The court concluded that returning two-year-old Charlotte to Jennifer's custody would create a substantial risk of detriment to Charlotte's physical and emotional well-being and there was not a substantial probability she would be returned by the 18-month date. The court

6

continued Charlotte's foster care placement, terminated Jennifer's services, and set a section 366.26 hearing.

Jennifer petitioned for review of the court's orders. (§ 366.26, subd. (*l*); Cal. Rules of Court, rule 8.452.) This court issued an order to show cause, the Agency responded, and the parties waived oral argument.

## DISCUSSION

Jennifer contends the evidence is insufficient to support the finding she received reasonable reunification services. She argues that aside from the Regional Center referral, the Agency made no attempt to help her with her developmental disabilities, developmental delays and special needs.[3] Jennifer complains the Agency did not refer her to an anger management program or related resource, did not provide unsupervised visitation and did not include Charlotte in the in-home services provided for the twins.

"Reunification services should be tailored to the particular needs of the family. [Citation.] The juvenile court and child welfare agency must accommodate the special needs of disabled . . . parents." (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1425-1426.) " 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the

---

[3]     Jennifer did not appeal the reunification plan ordered at the dispositional hearing or the reasonable services finding made at the six-month review hearing. She may not now challenge those matters. (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 811.) We limit our review to the period following the six-month review hearing and do not address Jennifer's complaint that the Agency "set [her] up for failure" by sending her a written questionnaire before that hearing. We do note, however, that Jennifer received services for more than a year during the pendency of this case, and was also offered services in connection with an earlier child abuse referral.

circumstances.' " (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598-599, quoting *In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)  "The 'adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case.' [Citation.]  To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .' " (*Tracy J.*, at p. 1426.)  In determining "whether substantial evidence supports the trial court's [reasonable services] finding, [we review] the evidence in a light most favorable to the prevailing party[,] and [indulge] in all legitimate and reasonable inferences to uphold the court's ruling." (*Katie V.*, at p. 598.)

Jennifer received services including individual therapy, a psychological evaluation, more than one parenting program and parenting instruction during supervised visitation.  She also participated in services provided to Jon and the twins, including family therapy and behavioral coaching.  She refused further services.  Jennifer was ineligible for Regional Center services, and social worker Lawhead knew of no additional services that would help Jennifer.  Considering the danger the twins posed to Charlotte, and Jennifer's inability to control their behavior, it was reasonable not to include Charlotte in the New Alternatives program with the twins.  Furthermore, during supervised visits, Jennifer needed prompting to ensure Charlotte's safety.  Before the six-month review hearing, the Agency intended to refer Jennifer to an anger management

class, but when her cognitive deficits were recognized, the Agency concluded that class would not benefit her. Substantial evidence supports the court's finding Jennifer received reasonable services.[4]

DISPOSITION

The petition is denied. The request for stay is denied.

McDONALD, J.

WE CONCUR:

NARES, Acting P. J.

McINTYRE, J.

---

[4]    Jennifer also requests we conduct "an independent review of the record." The authority on which she relies is inapposite. (*In re George T.* (2004) 33 Cal.4th 620, 634.) Jennifer additionally contends the 12-month review order caused harm by separating Charlotte from the twins. Jennifer did not raise this issue in the juvenile court and we need not consider it now.