Filed 10/31/13  In re Destiny G. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re DESTINY G., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B250377 (Super. Ct. No. JV 51169) (San Luis Obispo County) |
| RAUL G.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN LUIS OBISPO COUNTY,<br><br>    Respondent;<br>_____<br><br>SAN LUIS OBISPO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Real Party in Interest. | |

Raul A. G. (Father) is the presumed father of Destiny G., who was born on August 1, 2012 and who has been a dependent of the juvenile court since September 27, 2012.  Father seeks writ relief (Cal. Rules of Court, rules 8.452, 8.456) from the juvenile court's order terminating reunification services and setting the matter for a permanency

1

planning hearing.  (Welf. & Inst. Code, § 366.26.)[1]  He contends the order terminating services is not supported by substantial evidence.  We deny the writ.

*Facts*

Destiny G. was just shy of two months old when, on September 25, 2012, her biological mother, M. W. (Mother) was arrested for a probation violation.  Mother admitted to using heroin the day before.  On the day of her arrest, Mother tested positive for methamphetamine, opiates, marijuana and heroin.  Father was also briefly taken into custody because of his aggressive and hostile behavior toward the probation officer.  The probation officer told the social worker that he was concerned about leaving Destiny in Father's custody because of Father's hostile behavior and because Father might also have been using drugs.  When asked to take a drug test that day, Father refused.  He did, however, test the next day.  The test was negative for all substances.

Destiny had a severe diaper rash.  She also appeared to have not been bathed because she had "residue" in the folds of her neck, stringy hair and dried diaper rash ointment in the folds of her legs.  The parents had not been taking Destiny to her post natal medical appointments and had declined the services of a public health nurse.

Father has nine biological children with his wife, who lives in Kern County.  Those children were the subject of several child welfare referrals for general neglect, although it is not clear whether they were placed in foster care.  Father has two other children with a third woman, Rebecca H.  In January 2009, Father was convicted in Kern County of a misdemeanor violation of Penal Code section 273.5, inflicting corporal injury on a cohabitant, after he punched and kicked Rebecca H.  At the time, Rebecca H. was pregnant with Father's child and was holding their other child.  The incident was witnessed by another one of Rebecca H.'s children.  Father has a lengthy arrest record, including many arrests for driving under the influence, possession of controlled substances and various property crimes.

---

[1] All statutory references are to the Welfare & Institutions Code unless otherwise stated.

On September 28, 2012, the juvenile court ordered Destiny detained. It granted respondent discretion to determine an appropriate placement for Destiny, ordered a minimum of two one-hour visits per week, and gave respondent discretion to place Destiny with Father without further court order.

During the first week that Destiny was in foster care, Father had telephone calls and meetings with the social worker, foster parent and a public health nurse. On several occasions, service providers were required to speak to him about his defensive and hostile demeanor. Father consistently apologized and agreed to moderate his behavior. After visiting the motel in which Father had a studio apartment, the social worker agreed that his living arrangements met minimum community standards. Father was provided with a tub to bathe Destiny in and a car seat. He complied with requests to drug test and tested negative. Father also attended his scheduled visits with Destiny.

Mother was released from custody on October 4. That same day, Father signed a child placement agreement in which he agreed, among other things, to give the social worker unrestricted access to Destiny, to have Destiny evaluated for special services and comply with the therapists' recommendations, to "remain calm and refrain from yelling or behaving in a confrontational or combative manner in the presence of my daughter[,]" to comply with any order to take anger management classes, and to drug test as requested. In addition, Father agreed, that he would "not permit [Mother] to have contact with Destiny that is not explicitly approved by [respondent] and/or supervised by [respondent]. If [Mother] attempted to make contact in-person with myself or Destiny I will contact law enforcement and the assigned social worker immediately."

On October 11, respondent returned Destiny to Father's care. Four days later, a probation officer looking for Mother found located both Mother and Destiny in Father's motel room. Father permitted Mother to have access to Destiny without permission from or supervision by respondent.

Respondent filed an amended petition to once again remove Destiny from Father's custody and place her in foster care. Father submitted to jurisdiction and the juvenile court ordered Destiny detained in foster care. Father was granted eight hours of

3

visitation per week, supervised by the foster mother and by his own mother, plus an additional weekly one-hour visit with a "parent mentor." His case plan required him to begin anger management classes within four months, to participate in parent mentoring sessions, to have weekly meetings with Destiny's public health nurse, to attend all of her medical appointments and assessments and to "demonstrate an ability to hold the necessary boundaries in order to keep his child safe. This includes demonstrating an ability to prevent those who may be abusing substances and/or [Mother] from having contact with Destiny that is not explicitly approved by [Respondent]."

As the case progressed, Father consistently visited with Destiny. He also consistently tested negative for drug use. At the same time, respondent's staff remained concerned about his ability to communicate appropriately with service providers, his ability to attend to Destiny's medical appointments, and his willingness to keep Mother away from Destiny.

By December, Mother was once again out of custody and living with Father, although she had plans to move into a sober living home within a week or two. Respondent and Father had agreed that, once Mother moved out of Father's motel room and assuming Father was in compliance with his case plan at that time, Destiny would be returned to his custody. In the meantime, Father would have unsupervised visitation with Destiny.

At the time of the three-month review hearing in February, Mother was back in custody and Destiny was living with Father. He still had not begun anger management classes but was otherwise in compliance with his case plan.

In April, the court granted respondent's request that Destiny be returned to Father's custody with a permanent plan of reunification. At the next status review hearing in May, respondent recommended that family maintenance services for Father be continued for the next six months. This recommendation was made while Mother was still in custody; the status review hearing was scheduled to take place the day before Mother's release. Father had informed respondent that he was looking for a new residence and would like Mother "to come home as soon as she is approved by the social

4

worker."  Respondent expressed concerns about some bruising noted on Destiny and the fact that Father had missed one of her medical appointments.  Father agreed to a safety plan that Destiny would get to all of her doctor appointments and that he would pay attention to all safety issues.  He also stated he understood "that when [Mother] gets out of jail, she may not have any contact with Destiny without supervision by [respondent] or someone approved by the social worker until she has consistently engaged in her case plan and demonstrated her ability to stay drug free."  Father remained out of compliance with the requirement that he attend anger management classes.  Respondent noted, on the positive side, that Father had hired one of Destiny's former foster mothers to be her babysitter during his work day.

These positive developments ceased abruptly after Mother was released from jail.  On June 10, respondent obtained a protective custody warrant to take Destiny back into custody because Mother was once again living with Father and Destiny.  At the time, Mother was actively using illegal drugs and was not engaged in treatment.  Destiny had missed six appointments for early childhood services within the previous three weeks and had regressed developmentally.  Father also failed to take Destiny to a doctor's appointment and he still had not enrolled in anger management classes.  Respondent simultaneously filed a supplemental petition (§ 387) to place Destiny in foster care based on the same facts.

In an addendum report filed before the contested detention hearing on the supplemental petition, respondent listed three instances, between March 25 and June 10, when Father and Mother were seen together with Destiny.  Local police officers informed the social worker that they had received four reports about domestic violence in Father's motel room between March 12 and March 19.  While in Father's custody, respondent noted, Destiny had missed six appointments with her early childhood development therapist and one doctor's appointment.  In addition, Father had not started anger management classes.  Respondent also reported newly discovered information concerning Father's 2009 misdemeanor conviction of corporal injury to a cohabitant.  (§ 273.5.)  This incident occurred in Kern County and involved Rebecca H.  Father punched and kicked

5

her, while she holding one of their children and was pregnant with another. Although Father was offered reunification services in connection with that incident, he did not take advantage of them or attend visits with the children. Services were terminated in December 2009.

At the contested detention hearing on July 3, the social worker testified that Destiny was experiencing developmental delays. She was not crawling or sitting up on her own. She had regressed developmentally since her placement with Father. The social worker had received numerous reports of Mother and Father being together with Destiny, unsupervised. These reports came from Destiny's paternal grandmother, Mother's probation officer, and the director of the drug and alcohol program where Mother was ordered to drug test.

Father testified that he understood Destiny's early childhood development therapy sessions were voluntary, not mandatory. He also said he did not know the schedule of therapy appointments because Destiny's baby sitter usually took her. Father denied he was living with Mother or had allowed her unsupervised contact with Destiny. He took Destiny to the drug and alcohol program office, to make sure Mother showed up to do her drug test. The grandmother's report was wrong because she does not speak English well and misunderstood what she was saying. He had not arranged for anger management classes because the social worker gave him the wrong telephone number to call.

The court sustained the section 387 petition and ordered Destiny detained in foster care. It ordered supervised visitation for both parents and scheduled a disposition hearing for July 31. Destiny was placed in foster care with her maternal grandmother.

Respondent's disposition report for the July 31 hearing noted that Father and Mother had appeared together for a scheduled June 20 visit with Destiny. When the community service aide (CSA) told Father the visit was for him alone, he became angry and verbally abusive toward her. Mother tried to call the social worker but was unable to reach her. She went to another area of the park to wait while Father had his visit.

6

Destiny was rigid while Father argued with the (CSA). The CSA did not observe Destiny smiling or playing during the 30 minute visit. Eventually, Father handed Destiny back to the CSA and terminated the visit early, walking off with Mother.

Father did not attend the contested disposition hearing. At the hearing, the social worker testified she had changed her recommendation from reunification to termination of services because Father had demonstrated he was incapable of protecting Destiny from Mother. In addition, Father had not begun anger management classes, had failed to follow up on the recommendations from the public health nurse, and had allowed Destiny to miss therapy and medical appointments. Finally, the social worker expressed concern tht Destiny could be exposed to violence because Father hd no insight into how his problems with anger negatively affected her.

At the conclusion of the evidence, the court found that the reasons for Destiny's initial detention still existed. Father could not protect Destiny from Mother and refused to address his own propensity for anger and violence. The court terminated reunification services and set the matter for a section 366.26 hearing.

### Standard of Review

We are required to determine only whether the juvenile court's jurisdictional and dispositional findings are supported by substantial evidence. In doing so, we review the evidence in the light most favorable to the prevailing party and indulge all legitimate and reasonable inferences to uphold the juvenile court's orders. (*In re E. B.* (2010) 184 Cal.App.4th 568, 574-575; *Katie v. Superior Court* (2005) 130 Cal.App.4th 586, 598.)

### Discussion

Father contends the court erred in terminating services because there is evidence that Father could be reunified with Destiny within the statutory time. According to Father, the facts relied on to support termination of services were known to the social worker when she recommended extending family maintenance services to Father only one month before she changed her recommendation to the termination of those same services. We are not persuaded.

7

The question presented by a petition under section 387 is whether a minor's prior placement has been effective in protecting the minor. (*In re Javier G.* (2006) 137 Cal.App.4th 453, 460.) If the juvenile finds by clear and convincing evidence that "[t]here is, or would be a substantial danger to the physical health, safety, . . . or emotional well being of the minor if the minor were returned home," (361, subd. (c)(1)), it must terminate the prior placement and may order the child detained in foster care." (*In re Javier G., supra,* 137 Cal.App.4th at pp. 462-463.)

Destiny was under three years of age when she was originally detained. As a consequence, "the maximum period of reunification services is generally six months." (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1009, fn 4.) Within six months after the initial detention of a minor under three years of age, the court may set a permanency planning hearing under section 366.26 if it finds by clear and convincing evidence that "the parent has failed to participate regularly and make substantive progress in any court-ordered treatment plan." (Cal. Rules of Court, rule 5.710, subd. c(1)(D).) The hearing date may be continued for an additional six months if the court finds "a substantial probability that the child may be returned within 6 minths o within 12 months of the date the child entered foster care, whichever is sooner . . . ." (*Id.*)

The juvenile court here made each of the required findings and those findings are supported by substantial evidence. Destiny was originally detained because Father and Mother were neglecting her physical, emotional and developmental needs, because Mother was actively using illegal drugs, and because Father was not protecting her from Mother, Ten months later, these same conditions still existed. It is undisputed that Father failed to participate regularly and make substantive progress in his court-ordered treatment to complete anger management classes. He failed even to enroll in the program. Second, Father demonstrated absolutely no ability to protect Destiny from her drug-addicted biological mother. Every time Mother was released from jail, she immediately went back to living with Father, even if Destiny was also living with him. During those same periods, Father failed to take Destiny to her therapy and medical appointments, causing Destiny to regress developmentally. Under these circumstances

the juvenile court properly concluded there was no substantial probability Destiny could safely be returned to Father's custody within six months. The juvenile court properly terminated reunification services and scheduled the matter for a section 366.26 hearing.

*Disposition*

The petition for extraordinary writ (Cal. Rules of Court, rules 8.452, 8.456) is denied

NOT TO BE PUBLISHED.


YEGAN, J.


We concur:


GILBERT, P.J.


PERREN, J.

9

Linda D. Hurst, Judge

Superior Court County of San Luis Obispo

_____

Theresa G. Klein, for Petitioner.

Rita L. Neal, County Counsel, County of San Luis Obispo, Leslie H. Kraut, Depputy County Counsel, for Respondent.